IDA SMALL, Appellant, *v.* CLARENCE J. HOUSMAN et al., Respondents.

Principal and agent — conversion — action to recover damages for sale of securities hypothecated for margins — notice of proposed sale — question as to sufficiency of notice of sale, given to plaintiff's son and agent, one of fact for a jury not a question of law for the court.

Plaintiff, whose son was employed by defendants, a firm of stockbrokers, opened through him an account for buying and selling stocks and bonds upon margins. For more than two years plaintiff's transactions, which were quite numerous, were consummated through the agency of her son. Plaintiff then went abroad but gave the defendants no notice and left no foreign address with them and no directions concerning her account. The son continued to buy and sell through the defendants and when margins were needed, or demanded, procured securities of plaintiff from her safe deposit box, which were given to defendants to protect her margins. A panic coming on, the defendants demanded more security and the son, being unable to obtain instructions from plaintiff, gave them all of her securities in his possession. Defendants thereupon asked the son to order the sale of the hypothecated securities which he refused to do and requested defendants not to sell them. Defendants, however, upon a few hours' notice to the son, sold part of the securities. He then arranged with other brokers to carry part of plaintiff's account and was told in substance by one of the defendants that they would carry the balance of it until her return. Defendants, however, thereafter on short notice to the son sold some of the securities. This action is brought to recover from defendants damages for their conversion. *Held*, that the facts are sufficient to sustain the conclusion that plaintiff's son was her agent in the transactions with defendants and that notices of the proposed sale of plaintiff's securities given to her son were, in legal

effect, notices to her. *Held*, further, that the question whether an arrangement was made by which the defendants were to carry the balance of the account until plaintiff's return, and whether, under these circumstances, the notices of sale given both before and after the alleged agreement were reasonable and sufficient was not a question of law for the court but one of fact for the jury.

*Small* v. *Housman*, 142 App. Div. 760, reversed.

(Argued March 17, 1913; decided April 4, 1913.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered February 10, 1911, affirming a judgment in favor of defendants entered upon a verdict directed by the court.

The nature of the action and the facts, as far so material, are stated in the opinion.

*Benjamin N. Cardozo* and *George H. Engelhard* for appellant. The court erred in holding as a matter of law that notice to Eugene Small was notice to the plaintiff. (*F. Nat. Bank* v. *Mackey*, 158 N. Y. 140; *Poole* v. *Leask*, L. R. [33 Eq.] 155; *Hoffman* v. *Treadwell*, 2 T. & C. 57; *Valentine* v. *Appleby*, 87 Hun, 1; *Snyder* v. *Sloane*, 65 App. Div. 543; *Wickes* v. *Hatch*, 62 N. Y. 535; *Hamlin* v. *Sears*, 82 N. Y. 327; *Moore* v. *Potter*, 155 N. Y. 481; *John Hurd Co.* v. *Consol. Steel & Wire Co.*, 47 App. Div. 467; *Higgins* v. *Moore*, 34 N. Y. 417; *Central Trust Co.* v. *Folsom*, 167 N. Y. 285.) If it be assumed that Eugene Small was the plaintiff's agent for the purpose of receiving demands for margin and notices of sale, the notices were insufficient. (*McDonald* v. *M. S. Ry. Co.*, 167 N. Y. 66; *Content* v. *Banner*, 184 N. Y. 121; *Mullen* v. *Quinlan & Co.*, 195 N. Y. 109; *Lazare* v. *Allen*, 20 App. Div. 616; *Ellis* v. *Pond*, L. R. [1 Q. B.] 428; *Sanger* v. *Price*, 114 App. Div. 78; *Wheeler* v. *Newbould*, 16 N. Y. 392; *Strong* v. *Nat. Mech. Banking Assn.*, 45 N. Y. 718; *Treadwell* v. *Clark*, 114 App. Div. 493; *Rosenbaum* v. *Stiebel*, 137 App. Div. 912.)

*George Zabriskie* for respondents. The sale of plaintiff's securities was preceded by demand made for margin upon, and by notice of the sale given to, the plaintiff's agent, her son. (*Gruman* v. *Smith*, 81 N. Y. 25; *Capron* v. *Thompson*, 86 N. Y. 418; 1 Dos Passos on Stock Brokers, 181, 182; Story on Agency, §§ 239, 445; *Doty* v. *Wilson*, 14 Johns. 379; *Commercial Bank* v. *Warren*, 15 N. Y. 577; *Gillett* v. *Whiting*, 141 N. Y. 71; *Rand* v. *Whipple*, 71 App. Div. 62; *Cox* v. *A. Brewing Co.*, 56 Hun, 489; *Newman* v. *Lee*, 87 App. Div. 116; *Walsh* v. *H. Fire Ins. Co.*, 73 N. Y. 5; *Edwards* v. *Dooley*, 120 N. Y. 540; *Hanover Bank* v. *A. D. & T. Co.*, 148 N. Y. 612.) Notice of the time and place of sale of the securities was given to Eugene Small. (*Cameron* v. *Durkheim*, 55 N. Y. 425; *Pope* v. *T. H. C. & Mfg. Co.*, 107 N. Y. 61; *Romeyn* v. *Sickles*, 108 N. Y. 650; *Northam* v. *D. Co. Ins. Co.*, 177 N. Y. 73; *Brightson* v. *Claflin Co.*, 180 N. Y. 76; *Scott* v. *International Paper Co.*, 125 App. Div. 318; *Maher* v. *E. L. Ins. Co.*, 110 App. Div. 723, 727; *Ray* v. *United Traction Co.*, 96 App. Div. 48; *Wicks* v. *Hatch*, 62 N. Y. 535; *Robinson* v. *Crawford*, 31 App. Div. 228.)

WERNER, J. The plaintiff sues to recover damages for the conversion of certain of her stocks and bonds by the defendants. At Trial Term the court directed a verdict in favor of the defendants. The judgment entered upon this direction was affirmed at the Appellate Division. The question is whether the evidence for the plaintiff, supplemented by such favorable inferences as may properly be drawn therefrom, is of sufficient probative force and cogency to create an issue of fact; and the determination of that question naturally depends upon the view to be taken of the transactions out of which the controversy arises.

The defendants are stockbrokers in the city of New York, and members of the New York Stock Exchange.

In January, 1905, they employed Eugene W. Small, the son of the plaintiff, to work for ·them, and this relation continued until the end of October, 1907. Immediately after this employment of her son, and through him, the plaintiff opened an account with the defendants for the buying and selling of stocks and bonds. At that time the plaintiff had· no personal communication with either of the defendants or .with any one on their behalf except her son. Without dwelling upon unnecessary details it is sufficient to say that the account was a fairly active one, embracing a large number of purchases and sales all of which were consummated through the agency of the son acting for his mother, and the only communications which passed directly between the defendants and plaintiff were the periodical reports of transactions mailed by the former to the latter. This course of dealing continued without incident until July 19th, 1907, when the plaintiff went abroad. She was to be absent for several months, but she gave to the defendants no notice of her intentions and left with them no foreign address and no directions concerning her account. Meanwhile the son continued as before to buy and sell through the defendants for his mother's account, as appears from the itemized statements in the record, and when margins were needed or demanded he delivered to the defendants various securities which he obtained from Mr. Heinsheimer, a friend of the plaintiff, who had a key to her box in the Mercantile Safe Deposit vault. This continued until the latter part of August, when Mr. Heinsheimer also went to Europe, and before leaving he delivered to the plaintiff's son certain securities, most of which the latter delivered to the defendants on the 14th, 16th, 18th and 22nd of October, as margins on plaintiff's account. During the interval between August 14th and October 22nd the condition of the market had been steadily growing worse until the crisis was reached in the failure of the Knickerbocker Trust Company, which was followed

by the events that are a familiar part of recent financial history.   On the latter date, in response to importunities from both of the defendants, the plaintiff's son brought to them as margin 100 shares of Southern Pacific preferred, which he stated was the last he had of his mother's securities.   The defendant Housman, still unsatisfied, retorted "margin is needed on this account.   What are you going to do about it ?" and the plaintiff's son replied that he didn't know.   To Housman's inquiry whether the son could communicate with his mother, the son replied that he would try; that he would cable her.   He did send a cable on that day addressed to her at the Credit Lyonnaise, Paris, to which he received a reply from the bank indicating that the plaintiff's last address was not known.   On the morning of the 22nd of October the defendant Baruch had requested the plaintiff's son to give orders for the sale of stocks, but the latter had objected on the ground that he did not feel justified in selling them as his mother was not in the habit of selling stocks in a declining market, unless she felt that the intrinsic value of the stocks required it; and during the afternoon of the same day the defendant Housman reported to the plaintiff's son that he was going to sell $30,000 of Interborough Metropolitan $4\frac{1}{2}$'s which were very weak.   The son remonstrated, but without avail, and on the 25th $25,000 of these bonds were sold.   The son having reported to the defendants on the 23rd the answer which he had received from the Credit Lyonnaise in response to his first cable, sent another at the request of the defendants. On the 24th the defendants sold for account of the plaintiff 1,800 shares Union Pacific, and on the 25th other stocks to the extent of 1,000 shares.   The market was then in a critical condition, notwithstanding Mr. J. P. Morgan's loan of $25,000,000 on the afternoon of the 24th. When the plaintiff's son was notified of the sale of some Union Pacific preferred for his mother's account, he went to the defendant Housman and asked him to quit, at the

same time suggesting that he had an idea which might be of use in helping out the account. Without going through the details of that conversation it is enough to say that it resulted in the transfer to Werner & Brown, another firm of brokers, of certain specified securities "at present market prices buyer 30;" the term "buyer 30," being a trade abbreviation indicating that the purchaser is given 30 days within which to pay. The plaintiff's son testified that on October 25th after the "buyer 30" transaction had been concluded with Werner & Brown, he had a conversation with the defendant Baruch concerning the plaintiff's account; that Baruch indicated his willingness to carry what remained of the account until the plaintiff's return, if it were not for the high priced securities in the account, "meaning some St. Paul certificates which were at $115;" that the plaintiff's son thereupon drew the attention of Baruch to the fact that these certificates did not represent $115 a share, but only $40 a share; that there was paid on the certificates only 25 per cent, and that $75 was deducted from the price; that Baruch thereupon stated he didn't know that, but if it were so it would be all right; that Baruch and plaintiff's son then went to Lewinson, one of the defendant's employees, who verified what plaintiff's son had represented, and that Baruch concluded the conversation by stating "it would be all right." In the second cable sent to the plaintiff by her son on October 23rd, the latter had stated that the defendants were making active demands for funds, and on October 29th the son received a reply from the mother, dated at Gibraltar, stating in substance that the son's cable had just been received; that it could not be translated; and that arrangements would have to await plaintiff's return. Defendants did not wait, however, but notified plaintiff's son on the afternoon of October 29th that they were going to sell some more Interborough Metropolitan bonds; and they did sell $30,000 of them.

To those who are familiar with the record, it will be evident that the foregoing references to the evidence and the brief excerpts therefrom are intended to be nothing more than an outline of so much of the testimony as is relied upon by the plaintiff to support the contention that there were issues of fact which should have been submitted to the jury. We are not now concerned with the testimony for the defendants, or its probable weight, as compared with the testimony for the plaintiff.

The reciprocal rights and duties of the parties depend, of course, upon their relation to each other. The plaintiff was the owner and pledgor of the securities in question. The defendants held them as pledgees to secure plaintiff's debt to them for advances, interest and commissions. As there was no special contract between the parties, the contract implied by law was that the value of the pledged security should cover the debt with a margin over. If the value of the security depreciated, the defendants had the right to demand an increase of security which could be effected either by a reduction of the debt or by addition to the collateral, and upon the plaintiff's failure to respond to the demand, the collateral could be sold on reasonable and customary notice. (*Gruman* v. *Smith*, 81 N. Y. 25.)

At the trial, and on the argument of this appeal, defendants' counsel made something of the point that the complaint proceeds upon the theory that the defendants gave no notice of sale, while the evidence tends to establish notice, the effect of which the plaintiff seeks to evade upon the assumption that her son, to whom the notice was given, was not her agent. Aside from the fact that the point is highly technical, it seems to us quite untenable, for if the son was not the agent of his mother notice to him was not notice to her.

Among the questions to be considered, the first in logical order is whether the son was the agent of his mother. That he was for some purposes the agent of the defend-

ants is indisputable. It is equally obvious that in the business of opening an account with the defendants in the name of his mother, in giving orders to buy and sell stocks and bonds for her account, and in responding to calls for margin on the account, he was her agent and not the agent of the defendants. To this extent, indeed, the agency of the son for the mother is practically conceded. Not in express terms, to be sure, but in discreet silence respecting circumstances which are too conclusive for denial. So the question is not whether he was her agent, but whether, being her agent, he was such for all purposes, including the receiving of notices of sales. A few pertinent facts will suffice to characterize this feature of the case. The plaintiff's son gave the initial order. He gave every subsequent order to buy or sell during a period of two years and a half, and until the 22nd of October, 1907, when the crash came. To the time of his mother's departure for Europe there had been not less than a hundred transactions, and not once was there anything like a personal or written communication between the plaintiff and the defendants. When the plaintiff went abroad in July she was owing the defendants $283,000 against which the latter held a large number of securities. The plaintiff started on a journey to be extended for months, but she gave the defendants no notice that she was going, and no directions as to the disposition of her account in her absence. Neither did she give such directions to any one else; not even to her son, for she says she gave the subject no attention and she did not think of it. After her departure, as before, the son gave orders to buy and sell in at least thirty-four separate transactions involving 50,000 shares of stock, all of which were executed by the defendants. It should be emphasized that in none of these thirty-four transactions was there any special instruction from the plaintiff to her son, but in every one he assumed to exercise the general authority which had previously characterized his

agency. During the interval between July 19th and October 25th he responded to seven calls from defendants for additional margins, and finally when the plaintiff returned in November she ratified her son's conduct by paying the defendants' account, "reserving," in the language of her counsel at the trial, "any claim for the conversion of these securities."

As against this array of facts and their train of legitimate inferences, all bespeaking the agency of the son for his mother, there are none of such import or weight as to create an issue. The agency of the son for his mother was not inconsistent with his agency for the defendants. (*Henken* v. *Schwicker*, 174 N. Y. 298.) The two agencies were entirely separate, and they related to parties and subjects wholly distinct from each other. So also in respect of the extent of the son's agency for his mother, this is clearly a case in which, to say the least, we should invoke the rule that as to third persons who have the right to believe that the agent is acting within the scope of his authority, the principal is bound even when the actual authority has been exceeded. (Story on Agency, sec. 127; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 30.) But we may safely go further. The plaintiff should be held to have estopped herself from denying her son's general agency for her, because there were no instructions, secret or otherwise, limiting the apparently unfettered authority with which her acquiescence had invested her son. The question of estoppel is one of ethics and is to be enforced where in good conscience and honest dealing it ought to be. The plaintiff clothed her son with powers calculated to induce the defendants to believe that he had actual authority, and the defendants should not be called upon to pay the cost of her acquiescence. (*Hanover Nat. Bank* v. *Am. Dock & Trust Co.*, 148 N. Y. 612.) More than that, the plaintiff ratified her son's agency when, with full knowledge of all the facts, she paid the defendants' account. (Story on Agency, secs.

239, 445; *Gillett* v. *Whiting*, 141 N. Y. 71.) She reserved her right to sue for the alleged conversion of some of her stocks and bonds, but that is a matter which has no relation to the son's agency as we shall see farther on.

The conclusion that the son was the plaintiff's general agent in the transactions with the defendants necessarily involves the assumption that notice of sales to the agent was notice to the principal. The latter was in foreign lands, and the circumstances, no less than the agent's general authority, rendered it necessary that notice should be given to the agent. The effort to reach the plaintiff by cable, made at the suggestion of the defendants, is not inconsistent with this view, for that was obviously an attempt to give the plaintiff an opportunity to save herself after her agent had exhausted all the resources at his command. The sufficiency of the notice, however, presents an entirely different question. Assuming, as we do, that such notice as was given was the equivalent of similar notice to the plaintiff, it still remains to be decided whether it was sufficient. The reports of transactions rendered by the defendants to the plaintiff contained the statement that they were "subject in all respects to the rules and regulations of the New York Stock Exchange." We are not informed as to these rules and regulations. In the absence of evidence on that subject we must assume that the defendants stand upon their common-law rights. "The object to be attained by giving the notice is to afford the debtor an opportunity to redeem, and to be present at the sale to see and know that it is fairly conducted and the property disposed of to the best advantage. Unless the notice given be such as shall accomplish this purpose, it is an illusion and of no possible utility; because, if the creditor does no more than give the notice of his intention to sell, without saying when or where, or in what manner, he deprives the debtor of a substantial right which the notice is designed to secure." (*Wheeler* v. *Newbould*, 16 N. Y. 392, 401.) This is but

another way of saying that the notice must be reasonable in time, and definite as to the place and manner of sale. But the rule is a general one which must be applied to an infinite variety of circumstances. In the case at bar the conditions were exceptional. It was a time of tense excitement, of sudden and violent fluctuations in prices, of veritable panic in which individual judgment was torn from its moorings by the impact of popular frenzy. Notwithstanding these conditions it was still the duty of the defendants to give the plaintiff reasonable notice. Whether the notice given answers that description depends upon the circumstances. (*Content* v. *Banner*, 184 N. Y. 121, 123.) Can this question be decided as matter of law? We think not. The sale of October 24th took place at two o'clock in the afternoon. It followed two conversations on the same day between the plaintiff's son and the defendant Baruch. The sales of October 25th were apparently made immediately after a similar conversation between the same persons at ten o'clock in the forenoon of that day. We refrain from quoting any part of these conversations, lest we may appear to characterize them or hint at their effect. For present purposes we need say no more than that in our judgment these conversations seem to demonstrate the necessity of submitting to the jury as issues of fact the sufficiency of these notices.

As to the sale of October 29th a different question arises. Even if we are in error in holding that there were issues of fact as to sales of the 24th and 25th, there can be no doubt that such an issue was presented by the evidence of plaintiff's son in respect of an interview which he claims to have had with the defendant Baruch on the 29th. If his statement is to be credited, the " buyer 30 " arrangement with Werner & Brown was followed by the defendant Baruch's promise that what remained of the plaintiff's account would be carried by the defendants until the plaintiff's return. This prom-

ise, if made, was probably not an irrevocable contract, but it could not be totally ignored to the prejudice of the plaintiff. If the defendants by their promise did lead the plaintiff's son and agent to believe that he had nothing further to fear until his mother's return, they were bound at least to give reasonable notice of their intention to retract this promise. (*Toplitz* v. *Bauer*, 161 N. Y. 325; *Arnot* v. *Union Salt Co.*, 186 N. Y. 501, 511; *Lindenthal* v. *Germania L. Ins. Co.*, 174 N. Y. 76.) Whether such an arrangement was in truth made was clearly not a question of law for the court, but one of fact for the jury; and plaintiff's counsel not only asked that it be submitted as such, but took an exception to the ruling of the trial court denying the request.

The judgment should be reversed and a new trial granted, with costs to abide the event.

CULLEN, Ch. J., HISCOCK and CUDDEBACK, JJ., concur; COLLIN, J., concurs in result; GRAY and MILLER, JJ., not sitting.

Judgment reversed, etc.