# Esser *versus* Linderman *et al.*

1. Esser employed brokers to buy stock and "carry it." The brokers wrote him for further security, or they would not carry his stock. The stock remained with them unsold till it was worthless. In a suit by the brokers for the money advanced by them; his defence being that they should have sold the stock, he could not testify that he believed from the letter that they would not sell without further orders from him.

2. What the letter meant was a question of law for the court.

3. If the brokers had sold the stock without giving further notice and it had risen, they would have been responsible.

4. Having proved that they had purchased the stock, it was not necessary for the brokers to produce the certificate at the trial.

6. When one purchases a chattel for another, he may sue for the money without a tender of the thing: the delivery of the thing cannot be demanded until the money is paid or tendered.

February 16th and 17th 1872. Before AGNEW, SHARSWOOD and WILLIAMS, JJ. THOMPSON, C. J., at Nisi Prius.

Error to the District Court of *Philadelphia:* No. 142½, to July Term 1871.

On the 3d of May 1866, Henry R. Linderman and others, brokers in Philadelphia, trading as Linderman, Ely & Co., brought an action of assumpsit against George W. Esser, of Mauch Chunk, to recover from him a balance which they claimed to be due them on their purchase of stocks for him.

W. H. Ely, one of the plaintiffs, testified, that in 1865 the defendant wrote to the plaintiffs to purchase stock for him; the letter could not be found. They bought for him 200 shares of Mingo Oil stock May 22d 1865, 1000 shares of Royal Petroleum stock May 23d, and 300 shares of St. Nicholas Oil stock May 24th 1865; they informed him that the purchase had been made; they advanced the money and were to hold the stocks as security until he paid for them or gave further orders; they sold all the stocks but the Royal; the defendant had notice of the sales, they sold under his authority. They had agreed to carry the stocks for him, he to give them a margin to protect them; as "margin," he paid them $500 on May 20th and $200 on May 24th 1865. They had the stock put into their own names. The Royal stock became worthless; they "had a discretionary power to sell, taking care of the interests of defendant."

[Esser v. Linderman.]

They gave in evidence two letters from defendant of July 29th 1865: one was to the plaintiffs as a firm, in which he says:—

"I would have replied to your first, but thought I would be able to take from my business enough money to take up the Royal, but found, owing to the great demand for coal, that it will be impossible at present, though if necessary, I could borrow it. I did not think when I asked you what deposit you required, that I would be again called upon for more money, nor that my time would be limited in holding the stocks, or I would not have been so anxious to buy. I merely ask the same privilege that is accorded to others dealing in stocks. I expect of course to be charged accordingly or what is customary. I presume you have disposed of the Mingo and perhaps the St. Nicholas. * * * You can sell my St. Nicholas at 2½ if you think there is no prospect of its going any higher, but from a letter received from a broker am inclined to believe Mingo, St. Nicholas and Royal will advance far beyond what it is. Of course I will expect you to use your judgment in regard to it, and if you think there is a probability of my stocks going up, to hold on to them for a better price."

The other was to Ely individually, viz.:

"I received two letters from L. E. & Co. asking me to send them some money or take up some of my stocks. As I wrote them I did not reply to their first, thinking I would be able to take some money from my business to take up some, but found that I would not be able to do so owing to the unusual briskness of the trade. * * * I did not expect to be called upon again for any more money after making the required deposit, and expected to be dealt with the same as some others of your customers. I think ere this reaches you, you will have disposed of most of my stocks at a good figure, which will not require me to deposit again. I hope you will do the best you can with my stocks, and if there is a probability of their going up to hold on to them for a higher figure, and not make any sacrifices for the want of funds."

The plaintiffs gave evidence that they had bought for the defendant 1000 shares of Royal stock which was transferred to them on the 26th May 1865, and that at the trial it was utterly worthless.

The transfer book of the company showed that such transfer had been made.

The testimony of the defendant was that the plaintiffs were to hold the stock till he ordered them to sell; that he did not order them to sell after receiving the following letter:—

"Phila., Aug. 16th 1865.

"Geo. W. Esser, Esq.

"Dear Sir:—You have no doubt received our notice of sale of 200 Mingo at 2⅞ for your account; the price has since receded

[*Esser v.* Linderman.]

to 2½. Your account should be strengthened by a deposit of say $300, or you should take up the Royal and St. Nicholas, which we hold for you. Please do one or the other at once, and oblige

Yours truly,

LINDERMAN, ELY & CO.

" We simply ask that your account should be placed in a position that will insure us from loss. This point attended to, and we are satisfied to carry your stock, otherwise not."

Defendant then proposed to testify that he did not order plaintiffs to sell after the receipt of this letter, because its contents led him to believe that they would sell without such order, if he did not comply with its demands. This was objected to by the plaintiffs, and a bill of exceptions sealed.

He then gave in evidence the following letters:—

"Phila., May 20th 1865.

" G. W. Esser, Esq., Mauch Chunk, Pa.

" Dear Sir:—Yours of yesterday, requesting the purchase of (for your account) 1000 Royal Pet., 200 Mingo, and 300 St. Nicholas, and enclosing check for $500, as margin thereon, has been received. We have purchased for your account 200 Mingo @ 2¾. Balance of order will be executed on Monday. We think that $200 more will be sufficient margin on the stocks you have ordered purchased. * * *

LINDERMAN, ELY & CO."

"Phila., May 24th 1865.

" Geo. W. Esser, Esq., Mauch Chunk, Pa.

" Dear Sir:—Yours from Easton, enclosing check for $200, came duly to hand. We enclose notice of purchase of 100 St. Nicholas @ 2½, which fills your order; when you want to sell, let us know your limit.

LINDERMAN, ELY & CO."

"Phila., July 12th 1865.

" Geo. W. Esser, Esq., Mauch Chunk, Pa.

" Dear Sir:—We are at this time a little cramped for funds, and would like you to take up some of the stocks we hold for you. We do not usually carry stocks over 30 days, but as we had your order to sell, we waited for them to go up, until now, and the oil market is so very dull that unless these Cos. strike new wells they will not sell until fall. You will oblige us by an early answer. Yours truly,

LINDERMAN, ELY & CO."

Phila., July 31st 1865.

" Geo. W. Esser, Esq.

" Dear Sir:—Yours of the 29th is at hand, we note your remarks regarding the prices at which to sell your stocks. * * *

[Esser *v.* Linderman.]

"It is unusual for brokers to carry stocks over 30 days for one commission and we do not do it for any one, and we are asking of you no more than we have of every one else. We cannot carry the stocks for ever for the buying commission and interest. We will not object, however, to carry your stocks if you pay us ½ commissions every 30 days, provided you keep your margin good. When we asked for $750, stocks were higher, this is about used up now, and we must have $500 more to secure us. We think you will see this is reasonable, and send us the money at once. Write at once and give us your decision.

Linderman, Ely & Co."

Defendant made the following offers:

The Record of Sales of the Philadelphia Board of Brokers, for 1865, for the purpose of showing that Royal Petroleum stock sold at the board during the months of August, September, and October 1865, at prices ranging from 81 cents to 50 cents a share.

Stock Ledger of Royal Company, for the purpose of showing that plaintiffs as a firm and as individuals, owned large quantities of the stock of said company at the time of their transaction with the defendant.

The deposition of Frederick E. Swope, to show that Henry R. Linderman, one of plaintiffs, was an original incorporator in said company, and the owner of a corporate interest in that company at the time of said transaction.

The offers were all rejected by the court and several bills of exception sealed.

The defendant testified that he had no communication with the plaintiffs after August 16th 1865, and had not heard from them till this claim was made. He gave evidence that there had never been any stock standing in his name on the books of the Royal Company.

The defendant's 1st point was:

As plaintiffs have not produced a certificate of 1000 shares of Royal Petroleum stock, nor accounted for such non-production, they cannot recover from defendant the amount they allege they paid in the purchase of 1000 shares of said stock under their contract with him.

His 9th point was:

As plaintiffs notified defendant July 31st 1865, that if he did not comply with his contract they would sell the stocks, and as they, upon his not complying therewith, nor answering said notice, did sell some of said stocks and notify defendant thereof, and on August 16th 1865, again notify him to the same effect as their first notice, defendant had the right to expect that upon his again failing to comply and to answer said notice, plaintiffs would do, in this second instance, what they had done under their first notice, viz.: sell in accordance therewith, without unreasonable delay.

21 P. F. Smith—6

[Esser *v.* Linderman.]

Both points were refused.

The court charged: "The transaction between plaintiffs and defendant was a purchase of shares by the plaintiffs for the defendant upon his order. The plaintiffs held a two-fold relation toward defendant; first, as agents in the buying of the stocks, and second, as lenders of money wherewith to make the purchase,—they holding the stocks as security for the advances. Under their contract the plaintiffs were not bound to sell the stocks. [There was no duty upon the plaintiffs to sell, although they might have sold, after due notice, for their own protection, or without it, if authorized to do so.] [It is said they cannot recover for the Royal without producing upon the trial a certificate for 1000 shares of it, but this is not so; plaintiffs have shown that they purchased the stock for the defendant, and paid for it, and what they paid for it. They have produced evidence of a transfer of the stock on the books of the company; and one of them swears they have the stock still on hand. This is all that they need show. If the defendant had paid the advances he might have demanded the certificate."]

The verdict was for the plaintiffs for $1105.50.

The defendant removed the record to the Supreme Court by writ of error.

The first four assignments of error were, the rejection of his offers of evidence.

The remaining four were, declining his points and the parts of the charge in brackets.

*T. E. McElroy*, for plaintiff in error.

*A. Briggs*, for defendants in error.

The opinion of the court was delivered, February 26th 1872, by

SHARSWOOD, J.—It certainly was not competent for the defendant to state in his testimony, what the contents of the letter of the plaintiffs, to him of August 16th 1865, led him to believe. The question was what he had a right to infer from it, and that was a question of law upon the letter itself. There was no extrinsic evidence which created any ambiguity in the language, and which would have carried the case to the jury according to Smith *v.* Thompson, 8 Common Bench 44. "Your account," says the letter, "should be strengthened by a deposit of say $300, or you should take up the Royal and St. Nicholas which we hold for you." And in the postscript: "We simply ask that your account should be placed in a position that will insure us from loss. This point attended to, and we are satisfied to carry your stock, otherwise not." It seems they did sell the St. Nicholas, but not the Royal, and the defendant took the ground below that after this letter the plaintiffs were bound to sell, and were answerable to him for what the Royal would have produced at that time. But the letter most

[Esser v. Linderman.]

clearly called for an answer. The defendant was asked to increase his margin or take up the stock. " Please do one or the other at once," said the letter. Had the plaintiffs sold without giving further notice, and the stock had afterwards gone up, they would have been responsible, according to Diller v. Brubaker, 2 P. F. Smith 498. It is nothing to the purpose that they did sell the St. Nicholas. They assumed the risk, but had a right not to do so as to the Royal, but to hold it until they should receive orders to sell. Nor do we think that it was incumbent to produce a certificate for the stock on the trial. They gave evidence by the transfer-book of the company that they had bought the stock at the time the order was given, and one of the plaintiffs testified that they had possession of the certificate. When one man lays out money at the request of another in the purchase of a chattel, he can sue for the money without any tender of the thing. It is not until the defendant has paid or tendered the sum thus laid out and expended for his use and at his request, that he can demand its delivery. He may ask the court in the exercise of its equitable powers to control the execution so as to secure to him possession of the certificate, but it is no defence against the plaintiffs, action to prevent judgment.

Judgment affirmed.